The opinion of the' Court, by
Dargan, Ch.
On the death of Wm. 0. Martin, in November, 1839, he had in his possession three slaves — Esther, Hector, and Jack. Two children of Esther — Dave and Clarinda— were born after Martin’s death. Besides these negroes, the estate of the deceased was very small, not more than $66. Wiley J. Jefcoat became the administrator, and duly administered the small fund which came into his hands, and there is no controversy about that.
The litigation relates to the negroes. The administrator, in the honest and confident belief that the negroes did not belong to his intestate, did not reduce them to his possession, or set up any claim to them. The negroes were, undoubtedly, the property of Wm. 0. Martin. It will be appropriate, on this occasion, briefly to show in what manner, or by what title, Martin became possessed of them. He got them by his wife, Patsey Martin, who received them from her father, Elijah Jef-coat. The latter derived them under the deed of one Hoover, who, reserving to himself a life estate, conveyed the ancestors of the negroes in question to his daughter Jerusha, the wife of the said Elijah Jefcoat, in terms which he supposed would give his daughter a life estate, and at her death a life estate to Elijah Jefcoat, if he was the survivor, with a remainder, at his death, to the children of his daughter Jerusha, of whom Patsey, the wife of the intestate, was ,one. This was the dis *126 position which the donor intended, and thought he had accomplished. But the deed was couched in language that, after the termination of the donors life estate, would give Jerusha Jefcoat an absolute estate, upon which the marital rights of her husband, Elijah Jefcoat, attached; investing him with an absolute estate. But the parties all thought differently, and acted in conformity with their construction. Elijah Jefcoat himself, believing that he had only a life estate in the negroes, and that after his death, his children by his first wife, Jerusha, would be entitled to the negroes, as purchasers, under the deed of Hoover, made a compromise with them, by which he / was to retain three, and the rest were to be divided, presently, among the children of his wife, Jerusha. It was in this way that the intestate, in right of his wife, became possessed of the negroes in controversy, they being her share in the said division. This was in the year 1832. The intestate did not claim any right to the negroes. He said he had nothing to do with them. There was a great deal of evidence on this point, which impresses my mind with the conviction that William Martin, in his life time, and up to the day of his death, honestly believed that he had no right or title to the negroes, and disclaimed any such right. At the appraisement of the estate, old Mr. Elijah Jefcoat appeared and set up a claim to the negroes as his own, during his life, and after his death for his daughter, Mrs. Martin. It was also in proof, that it was understood not only in the family, but in the whole neighborhood, that these negroes were not Martin’s, but that they belonged to his wife; with much more evidence to the same effect. Upon no proper construction of the deed of Hoover, could such an opinion be supported, particularly after the division. But there was much in the terms of Hoover’s deed, calculated to mislead the common, uninstructed rnind, and by which one unlearned in the law might arrive at anything but the right construction. He consulted with the Ordinary, and was instructed by him to leave the negroes where' he found them, and he told the administrator that he had consulted *127 with three of the most eminent men then at the bar, who gave it as their opinion that, under the Hoover deed, Elijah Jefcoat had a life estate in the negroes. Thus advised and instructed, the administrator forbore to include the negroes in his returns, or to set up any claim to them. He left the negroes where he found them, that is, in the possession of the widow of the intestate, who, in 1844, married one Gabriel Sturkie.
Jerusha Sturkie, one of the children of Jerusha Hoover, who had intermarried with Richard Sturkie, for some reason, was left out in the division of 1832. In 1850 Elijah Jefcoat \ was about to emigrate to Alabama, Richard Sturkie and wife, '.believing that they had an interest in the negroes by way of 'remainder under the deed of Hoover, to fall in on the death of Elijah Jefcoat, filed against him a bill, in the nature of a bill quia timet, asking for security that the negroes should not be removed, and for the usual remedy in such cases. This case, in 1852, came on to be heard before Chancellor Wardlaw, who decided “that upon the death of Hoover,” (who had reserved to himself a life-estate in the negroes,) “ the estate became absolute in Elijah Jefcoat.” Then, for the first time, those parties became enlightened as to their true rights and interests under this deed and the partition. Then it occurred to the administrator that if Elijah Jefcoat was the absolute owner of the negroes, the division which he made in 1832 was valid, and could not be gainsaid.
The administrator now endeavored to retrieve his former error. He acted vigorously. He seized the negroes, that up to that time were in the possession of Gabriel Sturkie, retarded them to the Ordinary; procured from that officer an order for their sale, and did actually sell them, charging himself in his accounts with the proceeds of the sale and returning the same to the Ordinary. In this sale he also included one of the negroes, which he had purchased at a sale made by the administrator of Benjamin Jefcoat, which shews in a strong point of view the integrity of his heart. At the sale, he bought one of the negroes himself and sold two to Wiley S. Jefcoat, *128 for fair prices, with which he charged himself, as has been stated. But his awakened energy was too late. Sturkie brought actions at law for the negroes which had been taken from him, and recovered verdicts for their full value. These verdicts with the costs of suit have been paid by the administrator.
This suit has been instituted by the children of defendants’ intestate, or by some of them for an account of W. 0. Martin’s estate, and the object is to charge the administrator for the value of the negroes, which belonged to the estate of his intestate, and have been lost in the manner stated. The question for the Court is, whether under the circumstances he should be held accountable.
The negroes,, as I have already said, were unquestionably the property of the intestate. The error of the defendant was in leaving them in the possession of Sturkie so long, that he acquired a title to them by adverse possession and the statute of limitations.
A great deal of discretion must necessarily be vested in executors and administrators, as to embarking in litigation on behalf of the estates they represent. Certainly, no legal obligation or rule obliges them to litigate for doubtful claims.' If they litigate in good faith, they will be reimbursed for their expenses. If they do not litigate, in an attempt to make them liable for non-action, the question will be whether they acted in good faith. “An executor or administrator is not bound in all cases, and under all circumstances to litigate his testator’s or intestate’s title to goods found in his possession at the time of his death, but which are claimed by other persons. He is entitled to exerc.ise his discretion on the question of property, and if he surrender the goods, he cannot be made liable for the value, except upon proof of negligence or fraud.” Chap-pell vs. Brown, 1 Bail. L. 528.
The error ,of this administrator consisted in leaving the negroes in the possession of Sturkie until he acquired a title by the statute of limitations. After he discovered the right of *129 his intestate he acted with a great degree of energy. For his original error I think he is excusable. He did not take into his possession property, the title to which his intestate disclaimed. This disclaimer was in consonance with the general opinion of the neighborhood. He sought counsel from a quarter on which he might well suppose he could confidently rely. He was instructed by the Ordinary to let the negroes alone. The Ordinary professed to have founded his opinion upon the advice of three eminent men of the law. Indeed, • if the rule which I have cited is not to be reversed, and the \ administrator is not to be made liable in all cases where the right to property in his intestate’s possession at his death, is contested and he fails to bring or stand a suit, the defendant is to be excused. Not to hold him excusable would be to deny ' him any discretion. He committed an honest mistake. He acted throughout in good faith. He vigorously endeavored to retrieve his error, but failed. And this was done at a sacrifice of his own interest.
It is ordered and decreed, that the circuit decree be affirmed and the appeal be dismissed.
Dtjnkin & Wakdlaw, CC., concurred.

Appeal dismissed.